# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### January 24, 2014 Session

## ELIZABETH BRECKINRIDGE WHEELER
## v. JOSEPH ROBERT WHEELER

**Appeal from the Circuit Court for Davidson County**
**No. 09D2004    Philip E. Smith, Judge**

_____

**No. M2012-02154-COA-R3-CV - Filed April 15, 2014**

_____

Following a 26-year marriage, Wife was granted a divorce, designated the primary residential parent of their children and given sole decision making authority for the minor children's education, health and medical care, and extracurricular activities; Husband was ordered to pay child support, *pendente lite* support of $7,000 per month, post-divorce support at the same rate as *pendente lite* support until the marital residence was sold, transitional alimony of $3,600 for 48 months commencing upon the sale of the marital residence, and $25,000 of Wife's attorneys' fees. The parties' separate and marital assets were classified, and the marital assets and debts were divided. Husband appeals, challenging Wife's designation as the sole decision making authority for the children's educational and extracurricular activities, the amount of Wife's income for purposes of child support, the awards for *pendente lite* support, the indefinite award of post-divorce support and the additional award of transitional alimony for 48 months. Husband also challenges the classification and division of the marital estate, including holding him liable for one-half of the $335,000 home equity line of credit debt, most of which was incurred during the pendency of the divorce, and the award of attorneys' fees to Wife. We have determined that Wife is not entitled to receive post-divorce support of $7,000 per month in addition to the award of transitional alimony of $3,600 for a term of 48 months; therefore, we reverse the indefinite post-divorce support award of $7,000 per month. We also modify the award of transitional alimony of $3,600 per month, reducing the term from 48 months to 24 months with the term commencing upon the entry of the Final Decree of Divorce. We affirm the trial court in all other respects. As for Wife's request to recover the attorneys' fees she incurred on appeal, we respectfully deny that request.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed in Part, Reversed and Modified in Part and Remanded**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and RICHARD H. DINKINS, J., joined.

James L. Weatherly, Jr., Nashville, Tennessee, for the appellant, Joseph Robert Wheeler.

Andree Kahn Blumstein, Marlene Eskind Moses, Marissa Moses Russ, and April N. Watkins, Nashville, Tennessee, for the appellee, Elizabeth Breckinridge Wheeler.

## OPINION

Joseph R. Wheeler ("Husband") and Elizabeth B. Wheeler ("Wife") were married in 1986. Both parties are graduates of Vanderbilt University and obtained post-graduate degrees. Wife earned a Master of Business Administration ("MBA") from Vanderbilt, and Husband earned a law degree from the University of Tennessee.

The parties have three sons, who were 16, 13 and 10 years of age at the time of trial (now 19, 16 and 13). Prior to the birth of their third child in 2001, Wife pursued a very successful career as a research and financial analyst, earning in excess of $200,000 a year for the majority of her short career and in excess of $300,000 in 1999 and 2001. Husband went to work for the law firm of Cornelius & Collins upon graduation, where he continues to work. He too has been successful, but his earned income was substantially less than that of Wife between 1995 and 2001.

Although Wife quit working in 2001 to care for the children and had no earned income since that time, she inherited substantial assets after her father's death in 1998, which included an IRA valued on her Statement of Assets and Liabilities at $2,016,092 as of June 8, 2011, from which she receives mandatory distributions in excess of $70,000 each year. Wife is also a beneficiary of a testamentary trust created by her father, the Elizabeth B. Wheeler Children's Trust.[1] The Children's Trust contains assets valued at approximately $780,000, which includes a brokerage investment account and a condominium in Destin, Florida.

During the marriage, Wife handled all the family finances including depositing Husband's income checks and income from her separate assets, managing their joint accounts, paying the bills, as well as managing her separate property. Wife also managed the parties' home equity line of credit ("HELOC") they opened in the fall of 2007 when they acquired their present home. The HELOC was initially used to pay for home improvements

---

[1] Wife's father also created individual trusts for the eldest two children of the parties, intending these trusts to be used for the children's education.

to their new residence. Thereafter, funds were drawn from the HELOC to supplement their income to pay household and family expenses.

In June of 2009, Husband admitted to having an extramarital relationship. In July 2009, Wife filed a Complaint for Legal Separation; Husband filed an Answer and Counter-Complaint for divorce. Wife filed her Answer in August 2009, requesting that Husband's Counter-Complaint for divorce be dismissed. Over the next several months, the parties continued to live together with the hope the marriage could be saved.

Unfortunately, marital strife continued, and, in May 2010, Wife filed an Amended Complaint for Absolute Divorce alleging grounds of irreconcilable differences, inappropriate marital conduct, and adultery. Husband moved out of the marital residence in May 2010 and into a rented condominium; they have been separated ever since.

In June 2010, Wife filed a Motion for *Pendente Lite* Relief, seeking the establishment of a support obligation by Husband; prior to May 2010, Husband had voluntarily deposited his pay check into the family checking account from which Wife paid the family bills. The parties subsequently reached an agreement regarding *pendente lite* support, as well as other issues, and counsel informed the court of the terms of their agreement at a hearing on July 16, 2010. The Agreed Order, which was entered on October 15, 2010, stated that Husband would pay Wife $7,000 per month in *pendente lite* support. The agreed order also restricted Wife's use of the HELOC to the extent necessary to pay the mortgage, taxes and insurance for the marital residence, as well as interest on the HELOC debt. The order also authorized the distribution of a joint account, known as the MFS fund, whereby each spouse received $65,000, with the balance of the MFS fund placed in escrow to pay the parties' federal income tax for 2010. In addition, the order directed the parties to list the marital home for sale; Wife was permitted to remain in the home pending the sale.

In February 2011, Husband filed a motion to reduce his $7,000 per month *pendente lite* support obligation on the grounds of dwindling financial resources and a decrease in income. The trial court declined to consider the motion pending trial. In April 2011, Husband renewed his motion to reduce *pendente lite* support; as before, the trial court declined to consider the motion pending trial.

In May 2011, Husband filed an Amended Counter-Complaint for divorce alleging irreconcilable differences and inappropriate marital conduct. Husband also sought relief from any responsibility for the increasing HELOC debt, arguing that Wife failed to use her separate assets to supplement Husband's income as previously done. Wife timely filed her Answer and denied any agreement or practice to supplement his income with her separate assets.

The case was tried over twelve days from June 2011 until October 2011. In its Final Decree of Divorce dated April 2, 2012,[2] which incorporated a Permanent Parenting Plan, the trial court granted Wife the divorce on the grounds of adultery and inappropriate marital conduct, and Wife was designated primary residential parent with sole decision making authority. Father's child support obligation was set at $917 per month upon findings that Wife's gross income, all of which came from the mandatory IRA distributions, was $5,974.33 per month, and Husband's gross income was $14,032.29 per month.

The court found Husband delinquent in his support payments through October 2011 for which the court assessed an arrearage judgment against Husband of $33,500 for unpaid support. The court also found that Wife had dissipated marital assets by transferring $26,319.79 from the parties' joint account into the Elizabeth B. Wheeler Children's Trust, and offset that amount against the arrearage judgment of $33,500, resulting in a net support arrearage of $7,180.21.[3]

The court valued Wife's IRA at $1,819,591 and classified the IRA as Wife's separate property. As for the Children's Trust, which includes investment accounts and the Florida condominium, the court found that Wife had no present ownership interest in these assets, and, therefore, they were neither Wife's separate property nor marital property.

As for the assets classified as marital assets, which included the marital residence, Husband's retirement account, Wife's Morgan Stanley IRA, and other miscellaneous marital assets, Wife was awarded marital assets valued at $723,338.92, and Husband was awarded marital assets valued at $686,954.92. The parties were held equally liable for the mortgage. They were also held equally liable for the HELOC debt, which was approximately $335,000 at the time of trial, but would increase every month until the residence was sold. Pursuant to the court's order, the mortgage and the HELOC were to be paid in full at closing, and the net proceeds from the sale of the marital residence were to be distributed to the spouses equally.

The court did not modify the $7,000 per month *pendente lite* support obligation Husband had been paying since the entry of the agreed order on October 15, 2010; instead,

---

[2] On June 22, 2012, the trial court entered a Memorandum and Order, the effect of which was to correct an error in the Final Decree regarding the identification of Husband's separate property. The Order modified and redistributed the marital property previously set forth in the Final Decree.

[3] The trial court found that Wife had dissipated the marital assets by transferring funds from the HELOC to the Elizabeth B. Wheeler Children's Trust in satisfaction of a loan previously made by the trust. The trial court found this was done in response to learning of the infidelity of Husband, without his permission or knowledge; thus, the court found it was a dissipation of marital assets and reduced Husband's arrearage by this amount.

pursuant to the Final Decree, the court ordered Husband to continue paying Wife monthly support of $7,000 until the marital residence was sold. Additionally, Wife was awarded transitional alimony in the amount of $3,600 per month for 48 months, the term of which would begin following the sale of the marital residence. The trial court also ordered Husband to pay a portion of Wife's attorneys' fees, in the amount of $25,000.

Husband filed a timely appeal in which he raises numerous issues.

## STANDARD OF REVIEW

The standard of review of a trial court's findings of fact is de novo, and we presume that the findings of fact are correct unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). We also give great weight to a trial court's determinations of the credibility of witnesses. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997); *B & G Constr., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000). Trial courts are in a far better position than the appellate courts to observe the demeanor of the witnesses, and the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007) (citing *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991)).

## ANALYSIS

Husband raises eight issues on appeal. He contends the trial court erred in: (1) vesting Wife with sole decision making authority for the children's educational and extracurricular activities; (2) setting Husband's child support obligation; (3) determining that he had no interest in the Florida condominium; (4) valuing Husband's equity in his law firm; (5) allocating one-half of the HELOC debt to Husband; (6) failing to reduce Husband's *pendente lite* support obligation during the pendency of trial and extending that award indefinitely post-divorce pending the sale of the marital residence; (7) awarding Wife transitional alimony; and (8) awarding attorneys' fees to Wife.

## I. PARENTING PLAN – DECISION MAKING AUTHORITY

Husband contends the trial court erred in giving Wife sole decision making authority for the children's educational and extracurricular activities.

"Trial courts have broad discretion in devising permanent parenting plans and designating the primary residential parent." *Burton v. Burton*, No. E2007-02904- COA-R3-CV, 2009 WL 302301, at *2 (Tenn. Ct. App. Feb. 9, 2009) (citing *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999)). "In reaching such decisions the courts should consider the unique circumstances of each case." *Id.* (citing *Parker*, 986 S.W.2d at 563); *see also Nelson v. Nelson*, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001).

"There are currently two different statutes setting out non-exclusive lists of factors for the trial court to apply to help it reach the goal of determining a child's best interest." *Thompson v. Thompson*, No. M2011-02438-COA-R3-CV, 2012 WL 5266319, at *6 (Tenn. Ct. App. Oct. 24, 2012). Tennessee Code Annotated § 36-6-106 applies to custody determinations, and Tennessee Code Annotated § 36-6-404 governs the establishment of permanent parenting plans, *see Burden v. Burden*, 250 S.W.3d 899, 908 (Tenn. Ct. App. 2007); *see also Thompson*, 2012 WL 5266319, at *6, which are required to be incorporated into "any final decree or decree of modification in an action for absolute divorce, legal separation, annulment, or separate maintenance involving a minor child." Tenn. Code Ann. § 36-6-404 (2010). In determining who should be the primary residential parent and what the residential schedule should be, the court is to consider a list of factors set forth in Tennessee Code Annotated § 36-6-404(b). The list of factors contained in Tennessee Code Annotated § § 36-6-106 and 36-6-404 are "substantially similar" and both permit the court to allow for consideration of any other factors that the court deems relevant. *Thompson*, 2012 WL 5266319, at *6. Thus, in most cases, the analysis and result would be the same regardless of which set of factors is applied. *Id.*

In this case, the trial court applied the factors in Tennessee Code Annotated § 36-6-106, finding that the majority of factors favored Wife, including, *inter alia*, her role as primary caregiver, the importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment, and her willingness to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents. As for the reasonable preferences of the children, the trial court found that this factor slightly favored Husband. Based on these factors, as well as the factors set forth in Tennessee Code Annotated § 36-6-404 to formulate the permanent parenting plan and the testimony presented, the trial court found it in the best interests of the children that Wife be appointed the primary residential parent. Moreover, the trial court found that joint decision making authority between the parents would be "difficult, if not impossible" and determined that it is in the children's best interest that Wife have sole decision making authority for the children's education, health, and extracurricular activities.

Husband contends this was error in regards to the children's educational and extracurricular activities. In furtherance of this argument, he demonstrates his prior

involvement in the children's lives, especially in regards to scouting and athletics. Husband served as an adult leader in his children's scouting activities and coached several of his sons' baseball, basketball, and soccer teams. Husband is also concerned about Wife's reservations in continuing their sons's secondary education in private schools. Wife raises concerns regarding the financial burden of private school in lieu of saving for college, while Husband contends the children should continue their private school education despite this burden, relying on the children's trusts to pay for secondary school and potential athletic and academic scholarships to pay for college.

We find no error with the trial court's decision to grant Wife sole decision making authority regarding the children's education, health and medical care, and extracurricular activities. Tennessee Code Annotated § 36-6-407(b) states the court shall order sole decision making to one parent when it finds that both parents are opposed to mutual decision making. Subsection (c) further provides that in allocating decision making authority, the court shall consider the history of participation of each parent in decision making and whether the parents demonstrated the ability and desire to cooperate with one another in decision making regarding the children in physical care, health, education, extracurricular activities, and religion.

The record demonstrates that the parties are not able to make joint decisions regarding their children; in fact, both parties testified that doing so would be difficult due to the uncooperativeness of the other to communicate regarding the children's welfare. When asked by the trial court about how he and Wife would work through these issues in the future, Husband responded that "one of us is going to have to have the decision making authority in that particular area, to do, you know, what is in the best interest of the boys, to follow through on the commitments that they've made."

The trial court noted in its final order that Husband is controlling and "not one to easily compromise," and Husband "has made choices that indicate that he has put [his extramarital] relationship far and away above any other relationship including his relationship with [Wife] or the three children." Although it is encouraging that Husband is involved in the children's extracurricular activities, Wife has been the primary caregiver, and the children are well cared for under her attention. Based on the foregoing, we affirm the trial court's decision to give Wife sole decision making authority concerning the children's education, health, and extracurricular activities.

## II. CHILD SUPPORT

The trial court ordered Husband to pay Wife $917 per month in child support. The award was based on the child support guidelines and factual determinations concerning each

spouse's income. The court determined Wife's annual income to be $71,692 per year, or $5,974.33 per month, which was based on distributions from the IRA Wife inherited from her father. The court determined Husband's income to be $168,387.50 per year, or $14,032.29 per month, which was based on Husband's 2011 income projection statement from his law firm.

Husband contends the trial court erred in computing Wife's income from her IRA and in failing to find Wife voluntarily underemployed or unemployed.

## A. Wife's IRA Income

The trial court's determination of Wife's annual income from her inherited IRA was based upon past distributions[4] and the testimony of Wife's expert, Vic Alexander, a certified public accountant. He calculated the value of the IRA to be $1,819,591 as of December 31, 2010. Using this value, Mr. Alexander projected the income from the IRA by applying the prevailing twenty-year rate of return on Treasury notes of 3.94%, and multiplying that rate with the IRA value of $1,819,591.

Husband contends the trial court erred in valuing the IRA at $1,819,591; he insists the value was $2,016,092 as of June 8, 2011, which was the amount listed on Wife's Statement of Assets and Liabilities. Based upon this value, Husband insists that Wife's projected income would be $79,434.02 or $6,619.50 per month.

The trial court relied on Mr. Alexander's testimony in determining the value of the IRA and Wife's income therefrom. Although Husband presented credible evidence that the value of the IRA was greater and that the income therefrom would be greater, the value assigned by the trial court is within the range of evidence submitted and trial courts have wide discretion in placing a value on assets. *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987). Moreover, the income to be derived therefrom was based on the testimony of a financial expert. Accordingly, we find no error with the trial court's determination that Wife's income from the IRA would be $5,974.33 per month.

## B. Voluntary Underemployment or Unemployment

Husband also contends the trial court erred in finding that Wife was not voluntarily underemployed or unemployed.

---

[4]It is undisputed that the IRS rules mandate annual distributions because Wife inherited the IRA.

The Tennessee Child Support Guidelines allow the court to "[i]mput[e] additional gross income to a parent . . . [i]f a parent has been determined by a tribunal to be willfully and/or voluntarily underemployed or unemployed[.]" Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(i) (2008). This regulation is designed to prevent parents from avoiding their financial responsibility to their children by unreasonably failing to exercise their earning capacity. *Massey v. Casals*, 315 S.W.3d 788, 795 (Tenn. Ct. App. 2009). Under Tennessee law, there is no presumption that a parent is willfully or voluntarily underemployed or unemployed; to the contrary, the party alleging that a parent is willfully or voluntarily underemployed or unemployed carries the burden of proof. *Brewer v. Brewer*, No. M2005-02844-COA-R3CV, 2007 WL 3005346, at *8 (Tenn. Ct. App. Oct. 15, 2007) (citing Tenn. Comp. R. & Regs.1240-2-4-.04(3)(a)(2)(ii) (2007) ("The Guidelines do not presume that any parent is willfully and/or voluntarily under or unemployed."); *Richardson v. Spanos,* 189 S.W.3d 720, 727 (Tenn. Ct. App. 2005)). Determining whether a parent is willfully and voluntarily underemployed or unemployed are questions of fact that require careful considerations of all the attendant circumstances; thus, we shall review the trial court's determination regarding willful and voluntary underemployment or unemployment using Tenn. R. App. P. 13(d) and accord substantial deference to the trial court's decision. *Spanos*, 189 S.W.3d at 726.

The trial court explicitly found that Wife was not voluntarily underemployed or unemployed. In making its determination, the court looked to the factors set forth under Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iii) that are to be considered when determining whether an individual is voluntarily underemployed or unemployed. Specifically, the trial court relied on the fact that Wife was acting in the role of caretaker for the minor children when the parties were living in an intact family unit, as well as the length of time Wife remained out of the workforce for this purpose. *Id*. The court also noted that Wife has been a full-time stay-at-home caretaker since she left employment in 2001, and the minor children have benefitted from Wife being a full-time caretaker. Based on these and other factors, the trial court did not find Wife to be willfully and voluntarily underemployed or unemployed within the meaning of the Tennessee Child Support Guidelines.

Husband contends that Wife's failure to seek employment while the divorce action was pending constitutes a voluntary act of underemployment or unemployment. Considering Wife's exceptional success in the workplace in the past, we acknowledge that reasonable minds could differ as to whether her failure to pursue employment during the pendency of these proceedings constitutes voluntary underemployment or unemployment; nevertheless, based on the facts in this record, the years Wife has been unemployed, and the ages of the two younger children, who were 13 and 10 years old, respectively, at the time of trial, we are unable to conclude that the evidence preponderates against a finding that Wife is not voluntarily underemployed or unemployed. Thus, we find no error with this determination.

Accordingly, there is no basis upon which to impute additional income to Wife for calculating child support.

### III. MARITAL PROPERTY

Husband raises three issues regarding the division of the marital estate. Husband contends the trial court erred in finding he had no marital interest in the Florida condominium. He also contends the court erred in valuing his equity in his law firm and erred by failing to assign more, if not all, of the HELOC debt to Wife. We shall address each issue in turn.

### A. The Florida Condominium

The trial court found the condominium was neither Wife's separate nor marital property because it was the property of the Elizabeth B. Wheeler Children's Trust. Husband contends the Florida condominium is marital property because it was Wife's separate property, which subsequently transmuted to marital property due to repairs and improvements he personally made to the condominium.[5]

Husband argues that the condominium should be considered marital property because he spent marital funds on furnishings, paint supplies and tools, and he renovated bathrooms, painted, repaired blinds and furniture, and other general maintenance; therefore, he contends that the condominium should be considered marital property. We find this argument unpersuasive because a condition precedent to transmutation is that the property must be considered Wife's separate property; however, the condominium was never Wife's separate property because it belonged to the trust.

The Florida condominium was owned by Wife's father prior to his death in 1998. The Elizabeth B. Wheeler Children's Trust was created in the last will and testament of Wife's father, and it is undisputed that the condominium has been owned by the trust since the death of Wife's father. Wife is the trustee and one of two current beneficiaries of the trust; the other beneficiary is her father's widow, Wife's step-mother. The residuary beneficiaries are the children of Wife and Husband.

---

[5]Separate property can become marital property when its original owner commingles it with marital property. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002). The increase in the value of separate property may be considered marital property if the nonowner spouse contributed substantially to the separate property's preservation and appreciation. Tenn. Code Ann. § 36-4-121(b)(1)(B); *Cohen v. Cohen*, 937 S.W.2d 823, 832-33 (Tenn. 1996).

Separate property is defined as "[p]roperty acquired by a spouse at any time by gift, bequest, devise or descent," Tenn. Code Ann. § 36-4-121(b)(2)(D) (2011), while marital property is defined as "all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing, and owned by either or both spouses as of the date of filing of a complaint for divorce[.]" Tenn. Code Ann. § 36-4-121(b)(1)(A) (2011).

According to the record, the condominium was devised to the Elizabeth B. Wheeler Children's Trust, not to Wife, and it remains an asset of that trust. Because Wife did not inherit the condominium, it is not and never has been her separate property. Therefore, it could not transmute to marital property regardless of Husband's efforts to maintain and improve the condominium. We, therefore, affirm the ruling that the condominium is not marital property.

### B. Husband's Equity in the Law Firm

The trial court valued Husband's equity in his law firm at $37,192. Husband contends the evidence preponderates against this finding because the trial court made a mistake computing its value, which should have been set at $31,855.[6]

Parties have the burden to provide competent valuation evidence. *Kinard v. Kinard*, 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998). When valuation evidence is conflicting, the court may place a value on the property that is within the range of the values presented. *See Watters v. Watters*, 959 S.W.2d 585, 589 (Tenn. Ct. App. 1997). Decisions regarding the value of marital property are questions of fact; thus, they are not second-guessed on appeal unless they are not supported by a preponderance of the evidence. *Kinard*, 986 S.W.2d at 231.

In dividing the marital property, the trial court awarded Husband the entirety of his ownership interest in Cornelius & Collins and computed the value to be $37,192. The trial court relied on Wife's expert witness, Mr. Alexander, whose opinion was based, in part, on financials provided to him and on the law firm's Partnership Agreement, which stated that a partner of Husband's tenure "shall be entitled to receive 35% of the gross receipts from such partner's accrued billable time as, when and if it is collected by the firm."

---

[6]The trial court awarded Husband his ownership interest in Cornelius & Collins, which is not challenged on appeal. Only the value assigned is at issue; this is because, Husband contends, it affected the overall division of marital property.

Mr. Alexander opined that Husband had unpaid invoices totaling $36,856 and work in process totaling $69,407, which amounted to $106,263. He then calculated 35% of the total, which set the value of Husband's interest at $37,192.23. This value was adopted by the trial court and awarded to Husband as part of the division of the marital estate.

Husband contends that $15,248 of the total sum Mr. Alexander utilized should not have been considered because it is regarded as administrative costs from which he is not entitled to compensation. Husband testified that he was not entitled to compensation from the firm for these expenses. In addition, Thomas Carlton, the senior member of the firm, testified that these are not collectible fees. Furthermore, the information relied upon by Mr. Alexander expressly states that $15,248 relates to "administrative time and expenses, client development, time and expense related to keeping existing clients, recruiting, time and expense interviewing and courting potential candidates, and potential nonbillable time and expense for each items not for the firm."

Mr. Alexander acknowledged that if the work in process was attributable to administrative costs, then those fees would be outside of what Husband would be entitled under the partnership agreement. Further, Mr. Alexander stated that if that amount is not an account receivable, then Husband's partnership interest would be reduced from $37,192 to $31,855.09.

Based on the undisputed testimony of Mr. Carlton, that of Mr. Alexander and the financial records he relied upon, we find that the evidence preponderates against the trial court's valuation of Husband's interest. As Mr. Alexander conceded, Husband's interest should be reduced to $31,855.09 because $15,248 of the sum should not have been considered in valuing Husband's equity in the law firm. Therefore, the correct value of Husband's equity in his law firm is $31,855.09.

The foregoing notwithstanding, and although we have agreed with Husband as to the value of his equity in the law firm, Husband was awarded the equity in his law firm and the difference in value is insignificant to the division of the marital estate; moreover, it does not make the division of the marital assets inequitable. Accordingly, we see no reason for the trial court to reconsider the division of the marital estate.

C. Allocation of Debt: The Home Equity Line of Credit (HELOC)

At the time of trial, the HELOC debt was approximately $335,000. The trial court ruled that the spouses would be equally liable for the debt and ordered the debt be paid from the proceeds of the sale of the marital residence. The court also ruled that Wife could continue to borrow against the HELOC until the marital residence was sold, but only to the

extent necessary to pay the mortgage, insurance, and property taxes. Husband contends the court erred in not holding Wife liable for the entire HELOC debt or, alternatively, more than fifty percent of the debt.

The parties opened the HELOC in the fall of 2007 when they purchased their present marital residence. The purpose for opening the HELOC is disputed. Wife claims it was to cover any shortfalls in income created by her unemployment, while Husband insists the HELOC was to be used solely for home improvement purposes. In any case, as of June 2009, the month prior to the revelation that Husband was having an extramarital affair, the HELOC debt totaled $98,941. After learning of Husband's indiscretions, Wife stopped depositing the IRA distributions she received into the family account and proceeded to borrow greater sums from the HELOC on a more frequent basis to pay a variety of personal, family, and household expenses. During the sixteen month period from June 2009 until the *pendente lite* agreed order was entered in October 2010, the debt owing on the HELOC increased by $200,000, approximately $12,000 per month, from $98,941 to $300,518.

The rate at which the HELOC debt increased per month dropped dramatically with the entry of the October 2010 *pendente lite* order that expressly restricted Wife's future use of the HELOC to paying the mortgage, insurance, and property taxes on the marital residence. Over the next year, from the entry of the *pendente lite* order until the end of the trial in October 2011, the monthly draws were less than $5,000 per month and the HELOC debt increased by approximately $35,000 to $335,000.

The trial court found the HELOC was used for the benefit of the family, to support the family's life style, which often exceeded their income. This finding was based, in part, on Wife's testimony that she applied distributions from her inherited IRA to contribute to the family's income; however, when the economy caused a reduction in the distributions to her, she turned to the HELOC to cover any financial shortfall to pay the family's bills, including credit cards, household expenses, school, mortgage and HELOC, and insurance on the marital home. With regard to the dispute as to whether Husband and Wife had an agreement that any gap between his income and the family's expenses was to be funded from Wife's separate assets and income, particularly income from the IRA she inherited, the trial court gave greater weight to the testimony of Wife than Husband. The court found that Wife never agreed to use her IRA income to routinely pay the family's expenses.

Based upon the above, and other testimony, the trial court ordered that the HELOC debt be paid from the gross proceeds of the sale of the marital residence and that the net proceeds be divided equally between the parties. Because each spouse would receive one-half of the net proceeds from the sale of the marital residence, the result of this ruling caused the parties to share the HELOC debt equally.

-13-

The division of the marital estate includes not only dividing the marital assets but allocating the marital debt. *Alford v. Alford,* 120 S.W.3d 810, 813 (Tenn. 2003) (citing *Cutsinger v. Cutsinger,* 917 S.W.2d 238, 243 (Tenn. Ct. App. 1995); *Mondelli v. Howard*, 780 S.W.2d 769, 773(Tenn. Ct. App. 1989)). "'[M]arital debts' are all debts incurred *by either or both spouses* during the course of the marriage up to the date of the final divorce hearing." *Id.* (emphasis added). Thus, an examination of the manner in which a trial court divided the marital property must take into consideration how the trial court allocated the marital debt. *Owens v. Owens*, 241 S.W.3d 478, 490 (Tenn. Ct. App. 2007).

In determining the equitable distribution of marital debt, our Supreme Court has established the following guidelines: (1) the debt's purpose; (2) which party incurred the debt; (3) which party benefitted from incurring the debt; and (4) which party is best able to repay the debt. *Alford*, 120 S.W.3d at 813 (citing *Mondelli*, 780 S.W.2d at 773). "A careful application of these factors will insure the fairest possible allocation of debt. It will also protect the spouse who did not incur the debt from bearing responsibility for debts that are the result of personal excesses of the other spouse." *Id*. at 814.

The first factor is the debt's purpose and it is undisputed the parties opened the account for the purpose of paying for improvements to their new home; while it is disputed whether it was also to be used to supplement the family income, this is what occurred.

As for the second factor, who incurred the debt, it is undisputed that Wife handled all of the family's finances, that she paid the family's bills, and that she decided whether to draw from the HELOC and, if so, how much and when. Thus, Wife incurred the HELOC debt.

Regarding the third factor, the party that benefitted from incurring the debt, the trial court found that both spouses benefitted, due in part to the fact the HELOC was used to supplement deficiencies in the family's income since 2007. Wife testified, and the trial court found, that the HELOC debt was used to pay for family expenses, the mortgage, insurance, and taxes, among a variety of other things. Husband testified that he was aware Wife had previously used some of her separate assets to support the family's lifestyle in addition to his income; however, he insists he was unaware that the HELOC was being used to supplement their lifestyle. The record reveals that both parties contributed to the family's expenses, and, thus, the expanding debt. Credit card statements introduced into evidence support the trial court's finding that the HELOC was used to pay for family expenses. In fact, Husband and Wife continued to live together during the time Husband alleges Wife went on an "out of control spending spree." Husband did not move out until May 2010, almost a year after Wife filed her Complaint for Legal Separation, and the time during which Husband alleges Wife should be responsible for the debt. Moreover, Husband had charging privileges to one of the two credit cards during this time until the October 2010 *pendente lite* order was entered.

-14-

Husband used the joint credit card when he took trips to Las Vegas and Ohio in 2009 with one of his sons for a baseball tournament. He also used the credit card to purchase thousands of dollars of sporting equipment for the children or himself. Wife also used the credit cards for her benefit and that of the children. The monthly expenses as shown by the credit card statements for 2009 through 2011 did not show a substantial change before or during the trial, but they clearly revealed the family enjoyed a very comfortable lifestyle, unfortunately, one beyond Husband's means. Based upon the above, the evidence does not preponderate against the trial court's finding that both spouses and the family benefitted from incurring the HELOC debt.

As for the final factor, the court found that both parties are able to repay an equal share of this debt because, *inter alia*, they have equity in the residence that is sufficient to pay this debt, Wife has income and substantial separate assets with which to pay the debt, in excess of $1,800,000, and Husband testified that he should be able to earn a higher income once the divorce is over.

We acknowledge that reasonable minds could differ as to whether Wife's prior actions of depositing all of her IRA income into the family bank account evidenced an agreement that both of the spouse's income would be used to pay the family's bills; nevertheless, we are unable to conclude that the evidence preponderates against the trial court's findings as to the four factors identified above. Therefore, we affirm the holding that both spouses are equally liable for the HELOC debt.

## IV. *PENDENTE LITE* SUPPORT AND ALIMONY

Husband contends the trial court erred in failing to reduce his *pendente lite* obligation because the evidence preponderates against the trial court's finding that he had the ability to pay $7,000 per month pending trial. He also contends the court erred by ordering him to continue paying Wife $7,000 per month indefinitely until the sale of the marital residence. Further, he contends Wife is not the economically disadvantaged spouse; thus, the court erred in awarding her transitional alimony in the amount of $3,600 per month for a term of 48 months.

Husband also contends these awards are exacerbated by the fact that the trial court granted Wife permission to indefinitely use the HELOC to make payments on the mortgage, taxes, and insurance of the marital home (which totals approximately $5,000 per month) until the residence is sold, at which time the HELOC would be paid from the proceeds of the sale.

We begin our analysis with the issue of *pendente lite* support, and the recognition that a party may seek modification of a *pendente lite* order pending a final hearing. *See State ex rel. Jackson v. Jackson*, No. M2006-00598-COA-R3-CV, 2008 WL 820495, at *4-5 (Tenn. Ct. App. Mar. 26, 2008).

## A. *Pendente Lite* Support

For eleven months following the commencement of this action, Husband continued to reside in the marital residence; during this entire time he voluntarily submitted his income checks from the law firm to Wife, who then deposited them into the family checking account. He moved out in May 2010 when Wife amended her complaint to seek a divorce, and the last deposit to the family checking account was made on May 14, 2010. For the month of June 2010, it is undisputed that Husband gave Wife $9,000, which she deposited and used to pay the family's expenses. Husband made no other substantial contributions until the entry of the October 2010 agreed order which set *pendente lite* support at $7,000 per month. The trial court approved the agreed order but heard no evidence and made no findings as to Husband's ability to pay that amount or the family's needs.

Husband filed the first of two motions to reduce the amount of *pendente lite* support in February 2011, four months after the order went into effect. The grounds for his motion were that he could no longer afford to make the sizeable support payment due in part to a reduction in his income. More specifically, he contended that he entered into the agreed order immediately following the receipt of $65,000 from the MFS account (Wife received a similar distribution from the joint account), and he believed the divorce proceedings would be completed within a few months; because it had not, he had exhausted those funds and his income was insufficient to pay support of $7,000 per month. The trial court refused to consider the motion, explaining it did not consider motions to modify agreed *pendente lite* orders until trial; however, the court stated it would take the motion into consideration as evidence was introduced at trial and decide whether to make any modification when making other financial decisions.

Husband renewed his motion to reduce *pendente lite* support in April 2011; it suffered the same fate as the first motion.

The case was tried over twelve days and concluded in October 2011 at which time the court took all issues under advisement. In the Final Decree of Divorce entered on April 2, 2012, the trial court denied Husband's request for modification of *pendente lite* support, finding that Husband always had the ability to pay his support obligation and that Husband's decrease in income was "the result of his lack of production in terms of billable hours" at his law firm. The trial court also found that Husband made several large purchases for himself

while the divorce was pending, including a "2009 GMC Sierra truck, a Tracker fishing boat, and sapphire and diamond earrings and pendant, which [Husband] intended as a gift for his girlfriend."

On appeal, Husband contends the evidence preponderates against the trial court's finding that he could have produced more billable hours in order to pay the support obligation. In furtherance of this argument, Husband relies on a statement of his billable hours for the years 2001 through June 17, 2011. Husband contends his hours had not declined from the time of entry of the Agreed Order until he filed his first motion to modify five months later. However, the record shows that Husband's billable hours had decreased considerably from 2009, the year the divorce action was commenced. For the firm's fiscal year of 2008, the year prior to the divorce action, Husband's billable hours were 1,192.4. For 2009, when the divorce action was filed, his billable hours were 1,249.1; for 2010, his billable hours decreased dramatically to 699.7.[7] Husband argues that these decreases were attributable to the stress of the divorce, and the additional time he had put into the divorce litigation.

Although Husband testified that he devoted several hours to the divorce action, cell phone records show he spent many hours on the phone with his paramour during work hours, causing the family's cell phone bill to increase significantly; he also admitted frequently leaving work to visit his paramour. Mr. Carlton, the senior partner at Husband's law firm, testified that Husband's billable hours decreased substantially over the last two years.

Husband also contends that his purchases of a boat, a truck, and jewelry for his paramour during the divorce proceedings are not sufficient to support the trial court's finding that he had the ability to pay the $7,000 *pendente lite* support obligation. Husband purchased a fishing boat for $15,000 in June 2010, despite having two other boats, as well as a diamond and sapphire necklace for $3,000. He also purchased a used truck in December 2010 for $30,000, for which he made a $5,000 down payment and now pays almost $400 a month. Husband argues that these purchases had no effect on his ability to pay the support obligation in October 2010, because the items were purchased before the agreement and entry of the Agreed Order. The trial court disagreed.

Considering the foregoing and other evidence in the record, we have determined the evidence does not preponderate against the trial court's finding that Husband's reduction in income was the result of his lack of production of billable hours at the law firm and that his

---

[7]From 2001 to 2003, Husband's billable hours ranged from 1,807 to 1,610 per year; from 2004 to 2006 they averaged approximately 1,325 billable hours a year; and he billed 1,570 hours in 2007. Husband's most recent report revealed billable hours of 571 for the period from December 2010 until June 2011.

expenditures for a new boat, a truck, and jewelry for his paramour evidence an ability to pay *pendente lite* support of $7,000 per month.

Finding no error with the decision to not modify the *pendente lite* order as it pertained to Husband's support obligation *pending the conclusion of the divorce proceeding*; we affirm the judgment of the denial of Husband's motions to reduce *pendente lite* support.

## B. Alimony

The trial court ordered Husband to pay two separate awards of post-divorce support: one for an indefinite period and one for a specific term of 48 months. The court ordered Husband to pay $7,000 per month to Wife until the sale of the marital residence at which time Husband was ordered to commence paying transitional alimony of $3,600 per month for an additional 48 months. The trial court also granted Wife permission to continue using the HELOC to make payments on the mortgage, taxes, and insurance of the marital home until the residence was sold, at which time the HELOC would be paid from the proceeds of the sale.

Husband contends these awards were error because Wife is not the economically disadvantaged spouse; he specifically asserts the trial court made no finding that Wife was the economically disadvantaged spouse. Alternatively, Husband contends the two post-divorce awards are excessive in that they exceed both his ability to pay and Wife's needs.

Trial courts are afforded wide discretion in determining whether there is a need for spousal support, and if so, the nature, amount, and duration of the award. *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011) (citing *Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004); *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001); *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000)). Transitional alimony is appropriate "when a court finds that rehabilitation is not required but that the economically disadvantaged spouse needs financial assistance in adjusting to the economic consequences of the divorce." *Id.* at 109 (citing Tenn. Code Ann. § 36-5-121(d)(4), (g)(1); *Riggs v. Riggs*, 250 S.W.3d 453, 456 n. 5 (Tenn. Ct. App. 2007)). This type of alimony "is designed to aid a spouse who already possesses the capacity for self-sufficiency but needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income." *Id*. As such, this type of alimony is a form of short-term support. *Id*.

When determining whether to award alimony and the "nature, amount, length, and manner of payments," courts are required to consider the factors set forth at Tennessee Code

Annotated § 36-5-121(i).[8] *Id*. However, the two most important factors to consider are the disadvantaged spouse's need and the obligor spouse's ability to pay. *Id.* at 110 (citing *Riggs*, 250 S.W.3d at 457; *Bratton*, 136 S.W.3d at 605; *Robertson v. Robertson,* 76 S.W.3d 337, 342 (Tenn. 2002); *Burlew*, 40 S.W.3d at 470). But, if a court finds that a spouse is not "economically disadvantaged" or in need of additional support, then "that spouse is not entitled to support and our inquiry goes no further." *Tait v. Tait*, 207 S.W.3d 270, 276 (Tenn. Ct. App. 2006) (citing *Echols v. Echols*, No. E1999-00619-COA-R3-CV, 2000 WL 688589, at *7 (Tenn. Ct. App. May 30, 2000); *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn.1995) (stating that "the real need of the spouse seeking the support is the single most important factor" when determining whether to award alimony)).

On appeal, this Court may not substitute its judgment for that of the trial court; rather, it should presume that the trial court's alimony decision is correct and review the evidence in the light most favorable to that decision. *Gonsewski*, 350 S.W.3d at 105-06 (citing *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010)). The deference given to trial court decisions regarding spousal support follows from the recognition that such decisions are "factually driven" and involve "the careful balancing of many factors." *Id.* at 105 (citing *Kinard*, 986 S.W.2d at 235). We review awards of alimony under an abuse of discretion standard, and a trial court abuses its discretion only when its ruling "causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Id.* (citing *Wright*, 337 S.W.3d at 176; *Henderson*, 318 S.W.3d at 335).

The trial court ordered Husband to pay support to Wife of $7,000 per month until the sale of the marital residence. The court additionally held Husband responsible for one-half of any increases in the HELOC debt, which was estimated to increase by $5,000 per month until the sale of the marital residence. These two rulings imposed on Husband an indefinite obligation of $9,500 per month. In addition to these two obligations, the trial court ordered him to pay transitional alimony of $3,600 per month for an additional 48 months upon the sale of the marital residence. Based upon the above rulings, and assuming for example that the house is sold in one year following the divorce, Husband would be responsible for $84,000 of indefinite post-divorce support, $30,000 for his half of the increased HELOC

---

[8]These factors include, but are not limited to, the relative earning capacity, obligations, needs, and financial resources of each party, the relative education and training of each party, duration of the marriage, the age, mental condition and physical condition of each party, the separate assets of each party, provisions made with regard to the marital property, the standard of living of the parties established during the marriage, the extent to which each party has made such tangible and intangible contributions to the marriage, the relative fault of the parties, and such other factors as are necessary to consider the equities between the parties. *See* Tenn. Code Ann. § 36-5-121(i).

debt, and $172,800 for 48 months of transitional alimony. Thus, Husband's post-divorce obligations would total $286,800 if the house was sold in one year; this sum would, of course, increase or decrease by $9,500 per month depending on when the marital residence is sold.[9]

The trial court did not set forth findings to support the imposition of these post-divorce obligations. Moreover, as Husband correctly asserts, the trial court did not explicitly find Wife to be the economically disadvantaged spouse. We have concluded, however, that the fact the trial court awarded her two separate post-divorce support awards constitutes an implicit finding that she is the economically disadvantaged spouse. Thus, the issue is whether the facts in the record preponderate against the finding that Wife is the economically disadvantaged spouse for purposes of alimony.

We start our analysis with the spouses' respective incomes. The trial court found Wife's annual income to be $71,692 per year, which was based entirely on distributions Wife would continue to receive from the IRA she inherited from her father. The court determined Husband's income to be $168,387.50 per year, which was based on Husband's 2011 income projection statement from his law firm. We now turn our attention to the spouses' respective marital and separate assets.

The assets classified as marital assets include the marital residence, Husband's retirement account, Wife's Morgan Stanley IRA (not the one inherited from her father), a one-sixth share of a lake house, bank accounts, cars, boats, jewelry, and other miscellaneous marital assets, which were valued at approximately $1.4 million. Of this sum, Wife was awarded marital assets valued at $723,338.92, and Husband was awarded marital assets valued at $686,954.92. Thus, Wife received a slightly greater share of the marital assets but the disparity is neither significant nor inequitable.

The value and liquidity of their separate assets, however, is very significant. On her Statement of Assets and Liabilities presented at trial, Wife valued the IRA she owned as a separate asset at $2,016,092 as of June 8, 2011, although the trial court valued the IRA at $1,819,591, based on the testimony of Mr. Alexander. Other assets classified as Wife's separate assets included $86,000 of stocks and deposits in bank accounts and her new automobile that was valued at $25,880. Thus, using the values assigned by the trial court, Wife came out of the marriage with approximately $1.9 million in separate assets of which

_____

[9] While we note that the parties entered into an Agreed Order on December 27, 2012, for the sale of the marital residence with a closing date of January 31, 2013, as well as an additional Agreed Order on February 21, 2013, in which they agreed to accept an Amendment to an Agreement for the sale of the marital residence, these constitute post-judgment facts that are not pertinent to the analysis of the trial court's award of indefinite support at the time of divorce.

almost all were liquid and which were available to her without incurring penalties for early withdrawal.[10] Husband's separate assets total $176,450 which represents his one-half interest in a lake house he owns with his brother and which produces no income. Thus, Wife's separate assets are more than ten times greater than Husband's, and her separate assets are liquid, while his are not. Moreover, Wife's separate assets produce income of $71,692 a year, without diminishing the principal value of the IRA, while Husband's produce essentially no income.[11]

Combining the values of their respective separate assets and the share of marital assets awarded to each respective spouse, Wife came out of the marriage with marital and separate assets valued at $2.6 million; Husband came out of the marriage with marital and separate assets valued at $860,000.

When deciding the amount of post-divorce support to award Wife, the court reasoned that Wife should not have to encroach on the principal of the $1.8 million in the IRA to support herself; however, the trial court also found that Wife had an undergraduate degree and MBA from Vanderbilt University and that she worked full-time for the first twelve years of the marriage as a financial analyst during which time she earned substantially more income than Husband. In fact, the court found Wife earned $268,412 in 2000 and $397,496 in 2001, which was three times greater than Husband earned in any year during the same period. The court also found that Wife, understandably, stopped working in 2001 after the birth of the parties' third child. However, that child was 10 years old at the time of trial, and the record reveals that she made no attempt to obtain employment during the pendency of these proceedings which commenced in July 2009.

We agree with the trial court that it is unrealistic to conclude that Wife will immediately step into an employment opportunity as lucrative as the one she left in 2001; therefore, transitional support is in order. However, we must also analyze the amount and duration of the alimony award considering Wife's good health, excellent education, the age of the youngest child, and the substantial assets available to her in contrast to Husband's ability to pay, which is solely dependent upon his income from his law practice.

Husband's net annual income was found to be $107,181.25 and, yet, he was ordered to pay an indefinite award of $7,000 per month, representing $84,000 a year of post-divorce support, leaving Husband with disposable income of only $23,181 a year, $1,931.75 per

---

[10]As noted earlier, Wife inherited the $1.8 million IRA from her father; thus, she is not subject to early withdrawal penalties.

[11]Husband's retirement account would produce no available income without Husband incurring penalties for early withdrawal.

month, to support himself. Additionally, during this indefinite period Husband is also liable for half of the monthly draw on the HELOC, which totaled approximately $9,500 per month until the marital residence was sold. In addition to the above, Husband was ordered to pay, for a term of 48 months, $3,600 per month as transitional alimony after the sale of the marital residence.

As noted in the five-year hypothetical earlier, if the house sold in one year the aggregate of the above obligations would be $286,800 over this period. Moreover, Wife's income of $71,692 a year which would amount to $358,460 over this five-year period, and Wife's assets of $2.6 million, of which over $1.9 million is liquid, would not have diminished. Considering all of these facts and the factors in Tennessee Code Annotated § 36-5-121(i) relevant to this case, we have concluded that it would constitute an injustice to Husband for him to bear this heavy financial burden, particularly realizing that Wife's needs do not justify such an award. For the foregoing reasons, we have concluded that Wife's post-divorce support should be limited to transitional alimony at the rate of $3,600 per month, the amount set by the trial court, for a period of a 24 month.

Accordingly, we reverse and modify the two awards of post-divorce support. We reverse the indefinite award of $7,000 per month until the marital residence is sold, and we modify the duration of the award of transitional alimony from 48 months to 24 months at $3,600 per month as set by the trial court.[12]

Our ruling is consistent with that in *Tait v. Tait*, wherein the wife asserted that the trial court erred when it found that she did not need additional support to maintain her standard of living, despite the fact that the husband had the ability to pay. *Tait v. Tait*, 207 S.W.3d 270 (Tenn. Ct. App. 2006). In *Tait*, like here, the wife asserted that she was entitled to support because the husband was at fault for breaking up the marriage and that she should not be required to deplete her assets to support her needs. *Id*. at 277. Unlike here, Mrs. Tait also asserted that she was "incapable of rehabilitation." *Id*.

Specifically, the trial court in *Tait* considered the duration of the marriage, the age and mental condition of the parties, the extent to which it would be undesirable for the disadvantaged party to seek employment outside the home, the separate assets of each party, the relative fault of the parties, and the division of marital property. *Id*. The trial court also looked at the wife's needs and her financial resources to satisfy those needs. *Id*. The record showed that the wife claimed personal expenses totaling $7,344.52 per month, a figure

---

[12]For clarity, we neither reverse nor modify the trial court's decision to hold Husband liable for one-half of the HELOC debt, which includes the amount the debt increased pending the sale of the marital residence. Thus, Husband remains liable for one-half of the entire HELOC debt as the trial court ordered.

which, based upon the evidence presented at trial, the court found to be somewhat inflated. *Id*. In determining whether she had sufficient means to pay her expenses, the court considered the fact that she received nearly $1,000,000 in assets as part of the Marital Dissolution Agreement, $524,888 of which was in the form of a retirement account. *Id*. The court further considered the disparity of the division of marital assets, whereby the wife received $180,000 more than the husband, and $90,000 more than what she would have received had the trial court allocated the marital assets equally. *Id*. The court also noted, based on the division of marital assets, that she would receive $2,380 per month from the husband's pension plan until his retirement, at which time it would increase to $5,082 per month. *Id*. Additionally, the court considered expert testimony from a certified public accountant who testified that, based upon the wife's income from child support, pension, and future social security payments, the wife would have to exhaust $378,858 of the liquid assets from her share of the marital estate over a twenty-four to twenty-five year period in order to meet her monthly expenses; however, by the time the wife's liquid assets were exhausted, she would still have approximately $3,200,000 in her retirement account, along with her pension and social security benefits. *Id*. Based upon all of these factors, the court determined that the wife failed to demonstrate a need for additional support in order to maintain a lifestyle commensurate with the marital standard of living. *Id*. On appeal, we affirmed. *Id*.

In *Tait*, we noted that the trial court's finding that the wife did not prove a need for support was based upon the wife's share of the marital property as well as her income from the husband's pension plan (and future social security benefits she would receive at retirement age); however, nowhere in the record did the trial court impute income to the wife which could be earned from her post-divorce employment. *Id*. at 278. Furthermore, we found it significant that "although Wife testified that she suffered from lupus, arthritis, and various other ailments, no testimony, expert or lay, was presented to prove that the wife was incapable of working and earning income in addition to that she is already receiving." *Id*. at 278-79. In fact, the wife's attorney admitted at a post-trial hearing that the wife "had no disabilities or bodily deficiencies which prohibited her from securing employment if she chose to." *Id*. at 279. Based on the above and other factors set forth in the *Tait* opinion, we concluded that the wife failed to establish that she was in need of additional support.

Although there are several similarities in *Tait* and the case at bar, the facts here are sufficiently different to establish a short-term need for transitional support at the amount set by the trial court, but not for the length of time set; specifically, the age of the youngest child at the time of trial and the years Wife has worked at home for the benefit of the family.[13] The

---

[13]We also recognize another important difference in *Tait* and the posture of this appeal. In *Tait*, the court elected to affirm the trial court's decision concerning alimony; in this case we find it necessary to

(continued...)

facts that mitigate a need for transitional support include specifically the substantial disparity in the spouse's post-divorce assets, the liquidity of these assets, the income they produce, and Wife's opportunities for employment when she chooses to make herself available for employment. Thus, we reverse and modify as noted above.

## V. ATTORNEYS' FEES

### A. Award of Attorneys' Fees to Wife

The trial court ordered Husband to pay $25,000 of Wife's reasonable and necessary attorneys' fees, which was only a portion of the fees Wife incurred in the trial court. Husband asserts the trial court erred in requiring him to pay any of Wife's attorneys' fees.

An award of attorney's fees is appropriate when the disadvantaged spouse's income is not sufficient to pay his/her attorney's fees and the divorce fails to provide him/her with a revenue source, such as from the property division, or assets from which to pay his/her attorney's fees. *Yount v. Yount*, 91 S.W.3d 777, 783 (Tenn. Ct. App. 2002).

Attorney's fees in a divorce action constitute alimony in solido. *Id*.; *Wilder v. Wilder*, 66 S.W.3d 892, 894 (Tenn. Ct. App. 2001); *Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996); *Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992); *Storey v. Storey*, 835 S.W.2d 593, 597 (Tenn. Ct. App. 1992). When determining whether to award attorney's fees, the trial court must consider the relevant factors regarding alimony set forth in Tennessee Code Annotated § 36-5-121(i). Moreover, trial courts are afforded wide discretion in determining whether there is a need for attorney's fees as alimony in solido, and the trial court's decision will not be disturbed on appeal absent an abuse of discretion. *Gonsewski*, 350 S.W.3d at 105 (internal citations omitted).

The order requiring Husband to pay $25,000 of Wife's attorneys' fees reads, in pertinent part:

> The Court recognizes that [Wife] has a substantial separate estate from which she can pay her attorney's fees. The Court also recognizes that at this point in time, [Wife] is unemployed. The Court does recognize that there is a need on

---

(...continued)

reverse and modify the two alimony awards. In doing so, we applied the very deferential standard of review for alimony decisions and, after considering all of the facts and statutory factors that pertain to this decision, we reached the conclusion stated herein. As *Tait* explained, "[w]e review an award of alimony under an abuse of discretion standard." *Tait*, 207 S.W.3d at 276.

the part of [Wife] for assistance in paying her attorney's fees. [Wife] should not have to use her separate assets for the payment of all of her attorney's fees . . . [and] the Court recognizes that [Husband] will be better positioned in the future to acquire assets based on his anticipated higher earning capacity as evidenced by testimony during trial. The Court further finds that [Husband] does have the ability through his substantially higher income to assist [Wife] in defraying some of the cost of representation in this matter.

Although we may have chosen to deny Wife's request to recover her attorneys' fees incurred in the trial, due in part to the facts addressed in the previous section, it is not our prerogative to second guess the trial court in such matters. As noted above, trial courts are afforded wide discretion in determining whether to award attorneys' fees. *Id*. Therefore, we defer to the broad discretion afforded the trial court and affirm the award of $25,000 of attorneys' fees to Wife.

## B. Attorneys' Fees on Appeal

Wife seeks to recover the attorneys' fees she incurred on appeal. Whether to award attorney's fees on appeal is a matter within the sole discretion of this court. *Hill v. Hill*, No. M2006-02753-COA-R3-CV, 2007 WL 4404097, at *6 (Tenn. Ct. App. Dec. 17, 2007) (citing *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995)). In determining whether an award is appropriate, we take into consideration "the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that need be considered." *Id.* at *6 (citing *Dulin v. Dulin*, No. W2001-02969-COA-R3-CV, 2003 WL 22071454, at *10 (Tenn. Ct. App. Sept. 3, 2003)).

Both parties have pursued this appeal in good faith and each has enjoyed some success on material issues in this appeal. Further, as we noted, Wife came out of the marriage with significantly greater separate assets than Husband, she has liquid assets, passive income, and significant earning potential. For these reasons, and in an exercise of our discretion, we respectfully deny Wife's request to recover her attorneys' fees incurred on appeal.

## IN CONCLUSION

The judgment of the trial court is affirmed in part, reversed and modified in part, and this matter is remanded with costs of appeal assessed equally between the parties.

_____
FRANK G. CLEMENT, JR., JUDGE

-25-